IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

  Plaintiff,

vs.

MICHAEL RICARDO GOSSITT, JR.,

  Defendant.

No. CR10-0042

REPORT AND
RECOMMENDATION

## TABLE OF CONTENTS

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
  A.  Reasonable Suspicion. . . . . . . . . . . . . . . . . . . . . . . . . 5
  B.  Community Caretaking. . . . . . . . . . . . . . . . . . . . . . . . 7

V.  SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.  RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## I. INTRODUCTION

On the 13th day of September 2010, this matter came on for hearing on the Motion to Suppress (docket number 21) filed by the Defendant on August 31, 2010. The Government was represented by Assistant United States Attorney Marti Sue Sleister. Defendant Michael Ricardo Gossitt, Jr. appeared personally and was represented by his attorney, JoAnne M. Lilledahl

1

## II. PROCEDURAL HISTORY

On June 8, 2010, Defendant Michael Ricardo Gossitt, Jr. was charged by Indictment (docket number 2) with one count of being a felon in possession of a firearm. At the arraignment on August 3, 2010, Defendant entered a plea of not guilty. Trial was scheduled for October 4, 2010.

On August 31, 2010, Defendant timely filed the instant motion to suppress. As a consequence of the pending motion to suppress, the trial date was continued. Trial is now scheduled for November 15, 2010.

## III. RELEVANT FACTS

At 2:30 a.m. on February 5, 2010, Kevin Lukan finished his shift as a police officer with the Cedar Rapids Police Department.[1] After changing out of his uniform and into civilian clothes at the police station, Lukan started driving home in his personal vehicle. At about that time, Lukan sent a text message to Officer Sarah Vogel of the Cedar Rapids Police Department, advising her that he was off work. Lukan and Vogel have a personal romantic relationship.

When Officer Lukan was only a few blocks from the police station, his attention was drawn to a person whom he believed was intoxicated. Lukan was traveling eastbound on 8th Avenue when he observed an individual walking on a dirt path near a fence surrounding the construction site for the new federal courthouse. Lukan testified that "previously there has been some reports of being inside the fence area and it looked like he was coming from inside the fence area, so it drew my attention towards him."

At that location, 8th Avenue is a 4-lane undivided street traveling east and west. Officer Lukan was on the bridge crossing the Cedar River, in the southern-most lane, when he first observed the person near the courthouse construction site. According to Lukan, he observed the individual start walking across the street – in the middle of the

---

[1] Lukan testified that he normally works until 4:00 a.m., but took off early because he had to be in court the next morning.

2

block – toward a parking lot on the south side of 8th Avenue. Lukan testified that the person was "unsteady and staggering," and "it looked like he was about to fall down a few times," which led Lukan to believe that the individual may be intoxicated. According to Lukan, it was necessary to "slam on my brakes" in order to avoid the individual.[2]

At about that time, apparently after receiving Officer Lukan's text message that he was off work, Officer Vogel called Lukan on his cell phone.[3] Vogel was still on duty, patrolling the southeast quadrant near the downtown area. After exchanging greetings, Lukan asked Vogel "Where are you at now?" Lukan then told Vogel that a black male, wearing a black jacket and blue jeans, had walked out in front of him and appeared to be intoxicated. According to Vogel, Lukan reported that the individual was initially walking westbound on the north side of the road, which Lukan thought was "strange" because there was a sidewalk on the south side of the road. Lukan told Vogel that the individual walked in front of him, but Lukan did not say that he had to "slam" on his brakes.

Officer Vogel testified that she was only "a few blocks away" when she talked with Officer Lukan on the phone, and she immediately headed toward the area. According to Vogel, she arrived approximately two minutes later. As she crossed the 8th Avenue Bridge, traveling westward, Vogel observed a black male wearing a black coat and blue jeans on the sidewalk on the west side of the river. According to Vogel, the individual matched the description given by Lukan.

Officer Vogel stopped her squad car just past the individual's location, exited the vehicle, and approached the individual. At the hearing, Vogel identified Defendant as the

---

[2] It is unclear to the Court why, if Officer Lukan watched the individual "stagger" across three lanes of traffic, it would still be necessary to "slam" on his brakes to avoid him.

[3] While the record is imprecise, Vogel apparently called Lukan shortly after Lukan made his observations of the apparently intoxicated person crossing the street in front of him. Lukan testified that he was "about to call police dispatch" when he received Vogel's call.

3

person whom she encountered that night. Vogel asked Defendant "What's going on?" Defendant told Vogel that "he did not want to deal with me," and began walking away. According to Vogel, Defendant had bloodshot and watery eyes, slurred speech, and was "swaying" as he walked.[4] Vogel approached Defendant again and told him to "stop and talk to me." Vogel told Defendant that "a friend of mine" had reported that he had walked out in traffic.

Defendant kept on walking away. Officer Vogel then "grabbed his arm" in an effort to stop him. Defendant started backing up, with his arms raised, but then turned and "took off." Vogel was able to grab his arm and told him to put his hands behind his back, but Defendant "ignored my commands and tried to pull away." During the struggle, Defendant's jacket came off and he continued to run.

Officer Vogel began a foot pursuit, and called other officers for back-up. After running for about a block, Defendant stopped and "leaned against a building." Vogel told Defendant to lie down, but he refused to comply. Vogel testified that she administered "a series of strikes" to take Defendant to the ground. Three or four other officers arrived at about the same time and Defendant was handcuffed. After being handcuffed, Vogel found a .38 Colt "police officer style" handgun in Defendant's right front pocket. According to Vogel, Defendant disclosed the existence of the gun at almost the same time that she found it in his pocket. Defendant was arrested and charged with being a felon in possession of a firearm.

## IV. DISCUSSION

In his instant motion, Defendant asks that any evidence obtained as a result of the search of his person on February 5, 2010, and any statements obtained from him on that date, be suppressed. Defendant claims that his seizure and subsequent search were

---

[4] Vogel testified that the area was "well lit" and she was able to see "the glassiness and the bloodshot" of Defendant's eyes, which became "even more dominant" as she got closer.

4

violative of the Fourth Amendment. The Government asserts that the stop was supported by "reasonable suspicion" and, alternatively, that the officer was properly performing a "community caretaking function."

### A. *Reasonable Suspicion*

Not all contacts between a law enforcement officer and a private citizen implicate the Fourth Amendment. A law enforcement officer is free to approach an individual in public and ask questions. *United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."). The contact remains consensual, and no "seizure" occurs, if the person voluntarily stops and responds to the officer's questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required.") (internal citation omitted).

Here, Officer Vogel was authorized to stop her vehicle, approach the Defendant, and investigate the report which she received from Officer Lukan. By the same token, Defendant was free to ignore the officer and walk away. However, when Defendant told Vogel that he "did not want to deal with" her, and began walking away, Vogel grabbed his arm and attempted to stop him. At that point, a "seizure" occurred within the meaning of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

The Fourth Amendment prohibits unreasonable seizures. To justify Defendant's "seizure" under these circumstances, Officer Vogel must have a reasonable, articulable suspicion that criminal activity is afoot. *Id.* at 30. "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are common sense, nontechnical conceptions that deal with the 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231

(1983)). The reasonable suspicion standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but requires "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24.

Accordingly, the Court must examine the "totality of the circumstances" and determine whether Officer Vogel had a "'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Vogel was initially told by Officer Lukan that a black male, wearing a black jacket and blue jeans, had walked out in front of him and appeared to be intoxicated. After arriving on the scene a few minutes later, Vogel observed an individual matching the description walking a short distance from where Lukan reported his observations took place. Vogel testified that Defendant had bloodshot and watery eyes, slurred speech, and was "swaying" as he walked. Accordingly, Vogel had a "particularized and objective basis" for harboring a "reasonable suspicion" that Defendant was intoxicated. In attempting to stop Defendant and question him further, Vogel was acting on more than a "suspicion or hunch."

In his brief, Defendant argues that "[t]he telephone conversation between Officer Vogel and Officer Lukan is central to this case as it provided the primary basis for the *Terry* stop." The Court disagrees. The Fourth Amendment was not implicated when Vogel initially approached Defendant. It was only after Defendant refused to answer Vogel's questions and began to walk away that Vogel needed "reasonable suspicion" to proceed further. While Lukan's observations initially drew Defendant to Vogel's attention, it was not necessary for Vogel to rely on Lukan's observations to approach and question Defendant. After approaching Defendant, Vogel's own observations – Defendant's bloodshot and watery eyes, slurred speech, and swaying as he walked – established reasonable suspicion to believe that a crime was being committed, thereby

justifying Defendant's seizure.[5] That is, it was not necessary for Vogel to rely on Lukan's observations in establishing reasonable suspicion.

Defendant also suggests that *Terry* stops may not be authorized to investigate simple misdemeanors. According to Defendant, the Supreme Court "has not decided" the issue, citing *United States v. Hensley*, 469 U.S. 221 (1985). As noted by the Government in its brief, however, the Eighth Circuit Court of Appeals has upheld a *Terry* stop when Defendant was observed committing a petty misdemeanor. *See United States v. Banks*, 553 F.3d 1101, 1104 (8th Cir. 2009). The Court concludes that an officer may make a lawful *Terry* stop when he or she has reasonable suspicion that criminal activity is afoot, regardless of whether the crime is a felony or a misdemeanor.

### B. Community Caretaking

As set forth above, I believe that Officer Vogel had a reasonable suspicion that Defendant was intoxicated in a public place, thereby justifying a *Terry* stop. Accordingly, I do not believe that it is necessary for the district court to consider the Government's alternative argument that Vogel was performing a "community caretaking function." In the event the district court disagrees with my analysis on the issue of reasonable suspicion, however, the Court will also address the issue of community caretaking.

In *Cady v. Dombrowski*, 413 U.S. 433 (1973), the Supreme Court recognized that law enforcement officers are frequently involved in activities which are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. The Court described these activities as "community caretaking functions." The Eighth Circuit Court of Appeals has held that an officer performing a community caretaking function may be justified in actions which would otherwise be violative of the Fourth Amendment. *See, e.g., United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1028 (8th Cir. 2007) (authorizing a warrantless entry to a home

---

[5] Iowa Code section 123.46 provides, in part, that "[a] person shall not be intoxicated or simulate intoxication in a public place."

7

when the officer had a "legitimate concern for the safety of individuals" inside). Here, the Government argues that the community caretaking exception would authorize a *Terry*-type stop, even if the officer lacked reasonable suspicion to believe that a crime was being committed.

In support of its argument, the Government cites *United States v. King*, 990 F.2d 1552 (10th Cir. 1993), and *United States v. Rideau*, 949 F.2d 718 (5th Cir. 1991). In *King*, while directing traffic near a car accident, the officer observed a handgun on a driver's seat, partially tucked under King's right thigh. While state law permitted motorists to carry loaded weapons, concealed or otherwise, in their vehicles, the officer ordered King out of the vehicle at gunpoint. The district court granted King's motion to suppress, finding that the officer lacked reasonable suspicion to believe that criminal activity was afoot.

On appeal, the Government did not contest the district court's finding that the officer lacked a reasonable suspicion of criminal activity. The Tenth Circuit Court of Appeals noted that King was clearly seized, but also noted that the Fourth Amendment only prohibits *unreasonable* seizures. The Court concluded that the officer "was clearly exercising her 'community caretaking function' when she approached Defendants' car during the course of her investigation of a vehicle accident." *Id.* at 1560-61. Citing *Cady*, the Court stated:

> In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.

*Id.* at 1560. After concluding that the officer's detention of King was justified at its inception, and that the officer "could, in the course of the detention, separate Defendants from the pistol," the circuit court nonetheless affirmed the district court on the grounds that the officer overreacted. According to the appellate court, the officer could have

8

simply ordered the defendants out of the car. The Court concluded that the officer's conduct "went far beyond what was necessary to protect her safety." *Id*. at 1563.

The facts in *Rideau* more closely resemble those in the instant action. At 10:30 p.m., officers observed a person wearing dark clothing standing in the road. When the officer flashed his lights on and off, the person, who was later identified as Rideau, "stumbled as he stepped from the road." *Id*. at 719. When the officer got out of the car and asked the Defendant to identify himself, "Rideau began to back away." *Id*. The officer then reached out to pat down the defendant's outer clothing and felt what he believed to be a weapon. The officer's partner grabbed Rideau's other arm and a loaded firearm was retrieved from Rideau's pocket. At the suppression hearing, the officer testified that he thought Rideau might be intoxicated and that he stopped him in order to check on his condition.

In appealing his conviction for being a felon in possession of a firearm, Rideau argued that the officers lacked reasonable suspicion to conduct a *Terry* stop. Acknowledging that *Terry* provides that an officer may briefly detain an individual whom he suspects is involved in criminal activity, a panel of the Fifth Circuit Court of Appeals stated that *Terry* "did not exclude the possibility that an officer may stop an individual for other reasons consistent with the Fourth Amendment." *Id*. at 720. Citing the community caretaking functions described in *Cady*, the Court found that the officers were not only authorized to stop Rideau, but were obligated to do so.

> The officers would have been derelict in their duties had they
> not stopped Rideau to check on his condition. A man wearing
> dark clothing who is standing in the middle of the road and
> possibly intoxicated presents a hazard to himself and to others.

*Id*. The Court nonetheless reversed defendant's conviction, however, finding that the circumstances did not support the officer's pat down search of the defendant.

The case was then heard *en banc* by the Fifth Circuit Court of Appeals. This time, the Court affirmed defendant's conviction. In the *en banc* decision, the majority did not

rely solely on the officers' community caretaking responsibilities. Instead, the majority also found reasonable suspicion to justify a *Terry* stop.

> There is no serious question that Ellison had reasonable suspicion to detain Rideau. Rideau had been standing in the roadway at night in a high crime area, where public drunkenness was common, and stumbled out of the road only when Ellison flashed his lights at him. Ellison had reason to believe that Rideau was drunk. Since public intoxication is a criminal offense under Texas law, the officers had adequate grounds for a stop. In any event, Terry recognizes that "encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." Police have long served the public welfare by removing intoxicated people from the public streets, where they pose a hazard to themselves and others. Officer Ellison was warranted in stopping to investigate the situation and check on the man's condition.

*United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (internal citations omitted).

In *Winters v. Adams*, 254 F.3d 758 (8th Cir. 2001), the Eighth Circuit Court of Appeals found that "the reasoning set forth in *King* and *Rideau* is sound." *Id*. at 764. In *Winters*, officers responded to a report that a "person was possibly intoxicated and was observed exiting and reentering a vehicle that was parked on a dead-end street." *Id*. at 760. When officers arrived, the person "raised the car window, locked the door and stated that he wished to be left alone." *Id*. Eventually, officers broke a window to gain access to the vehicle and, after a struggle, took the person into custody.

The officers admitted that they did not possess a reasonable suspicion of criminal wrongdoing when they initially approached the person's vehicle, but argued that they were justified in detaining the person under their community caretaking function. The Eighth Circuit Court of Appeals agreed.

> The Court finds that the reasoning set forth in *King* and *Rideau* is sound. In the instant case, the appellee argues that the police officers were required simply to walk away from appellee's vehicle, thus perhaps permitting a possibly

>   intoxicated individual to drive the vehicle, potentially harming himself and other citizens. The Court simply cannot conclude that the strictures of *Terry* and its progeny compel such a result. Like the officers in *Rideau*, this Court finds that Officers Adams and Prahm "would have been derelict in their duties" had they not detained appellee Winters.

*Id.* 764 (internal citations omitted). In a footnote, the Court noted that while it was not argued by the officers on appeal, it was also "likely" that they had reasonable suspicion to detain Winters. *Id.* at n.10.

Here, Officer Vogel had information from a reliable source (Officer Lukan) that a person matching Defendant's description was apparently intoxicated and had staggered out in front of Lukan's vehicle. While Defendant was on the sidewalk by the time Vogel reached the area, he had not yet reached his destination and continued to potentially constitute a threat to himself and others. It was also possible that Defendant's behavior – staggering in front of an oncoming vehicle – was the result of a medical problem. Vogel was justified in stopping Defendant to investigate further.

## V. SUMMARY

In summary, I believe that the Fourth Amendment was not implicated when Officer Vogel initially approached Defendant to ask him questions. When Defendant responded that he did not want to interact with Vogel, however, then reasonable suspicion was required for further action by Vogel. I believe that reasonable suspicion is established in this case by Vogel's observations of Defendant's apparent intoxication. Alternatively, I believe Vogel, in performing her community caretaking function, was justified in stopping Defendant to investigate the report that he had staggered into the street in front of an oncoming vehicle. Accordingly, I believe that Defendant's motion to suppress should be denied.

## VI. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the district court **DENY** the Motion to Suppress (docket number 21) filed by Defendant.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on September 13, 2010.*

DATED this 16th day of September, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA